IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| TERRY ARCHIE, as Administrator of the Estate of Teria C. Archie, | ) ) ) ) | |
| Plaintiff, | ) ) ) | CIVIL ACTION NO. 2:19cv508-MHT (WO) |
| v. | ) ) | |
| COVINGTON COUNTY, et al., | ) ) | |
| Defendants. | ) | |

OPINION AND ORDER

Plaintiff is the administrator of the estate of Teria Archie, who died at age 36 while detained pretrial at the Covington County Jail. According to the administrator's complaint, Archie had hypertension and repeatedly requested medical assistance for chest pain and shortness of breath in the weeks before her death. Other than aspirin, she did not receive medical intervention until she was found nonresponsive in her cell in July 2017.

For their alleged roles in Archie's death, the administrator has named seven defendants in this lawsuit: Covington County, Alabama; then-county sheriff Dennis

Meeks; Southern Health Partners, the private health-care provider for the jail; and several jail staff members, including the jail administrator Alan Syler, a lower-level officer named Melissa Leslie, a nurse named Wanda Craft, and the jail's doctor, Pamela Barber. The administrator asserts six claims. He asserts three claims under 42 U.S.C. § 1983: Count 1, for deliberate indifference to Archie's serious medical needs against all defendants; Count 5, for failure to provide constitutionally adequate supervision and training against all defendants except Leslie; and Count 6, for failure to act to address known problems with medical care at the jail against all defendants except Leslie and Craft. He asserts two claims, Counts 2 and 3, against only the county, under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. And he asserts one state-law claim, Count 4, against all defendants for wrongful death. The court has

2

jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), 28 U.S.C. § 1367 (supplemental jurisdiction), and 29 U.S.C. § 794a (Section 504).

This case is now before the court on the partial motion to dismiss filed by Covington County, former sheriff Meeks, and jail administrator Syler.[1] *See* Motion to Dismiss (Doc. 41). These defendants move to dismiss the ADA and Section 504 claims (Counts 2 and 3) against the county for failure to state a claim; the wrongful-death claim (Count 4) as barred by state-law immunity only insofar as it is brought against Meeks; the failure-to-supervise and failure-to-act claims (Counts 5 and 6) against the county because counties in Alabama are

---

[1]. The motion to dismiss asserts in the opening paragraph that it is also filed on behalf of officer Leslie. However, in the motion's body and accompanying brief, there is no discussion about dismissal of any of the counts of the complaint as alleged against Leslie. *See* Motion to Dismiss (Doc. 41) and Brief (Doc. 42). This opinion therefore does not address Leslie in its discussion.

not empowered or obligated to supervise the jails present therein; and those same two claims against Meeks and Syler as barred by qualified immunity.   No party seeks dismissal of count 1, the deliberate-indifference claim.

For the reasons set forth below, the motion will be granted in part and denied in part.   Count 6, the failure-to-act claim, is not sufficiently established in law and will be dismissed as against the county, Meeks, and Syler.   In all other respects, the motion will be denied.


## I. MOTION-TO-DISMISS STANDARD

When considering a defendant's Rule 12(b)(6) motion to dismiss for failure to state a claim, the court accepts the plaintiff's allegations as true, *see Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984), and construes the complaint in the plaintiff's favor, *see Duke v. Cleland*, 5 F.3d 1399, 1402 (11th Cir. 1993).   The court may draw "reasonable inferences" from the facts alleged in the

complaint.  *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).

To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

## II. FACTUAL BACKGROUND

The factual allegations of the complaint indicate that at the time of her death, Archie was detained pretrial at Covington County Jail after she was arrested for unpaid child support.  She had been at the jail for about two months when she died in July 2017.

Archie had a "history of high blood pressure" and

5

had been diagnosed with hypertension.   Second Amended
Complaint (Doc. 40) at ¶¶ 6, 14.   According to the
complaint, "In the weeks leading up to her death, Archie
continually requested medical attention because she was
suffering severe chest pains and shortness of breath."
*Id.* at ¶ 16.   Her blood pressure was checked and found
to be "unusually high at times for someone her age."   *Id.*
at ¶ 25.   She was not taken to a hospital or administered
any diagnostic testing to determine the severity of her
condition; instead, when she requested medical attention,
she would be given aspirin and ordered to return to her
cell.   *See id.* at ¶¶ 17-19.   Defendant Barber, the jail's
doctor, "repeatedly refused to see Archie" when she
sought medical attention, and after several weeks of such
requests, Barber and nurse Craft began simply removing
Archie's name from lists of inmates to be seen during
Barber's medical visitations.   *Id.* at ¶¶ 21-22.

This denial of medical care was apparently a routine
practice at Covington County Jail.   Medical care at the

jail was provided through a contract between the county and Southern Health Partners, which employed Barber and staffed her to the facility. *See id.* at ¶¶ 11-12. Barber was supposed to conduct weekly visits with inmates requiring medical attention, but "[i]t was a known fact at the jail" that she "would pick and choose the inmates she would see on her visits and, many times, would not show up for the regular weekly visits." *Id.* at ¶ 26. Indeed, she often came to the jail only once a month to provide medical services. *See id.* As a result, "[i]nmates with disabilities who needed to be seen by a doctor, including Archie, were left untreated or inadequately treated" as Barber and the other medical staff "would pick and choose who they wanted to treat and when." *Id.* at ¶ 28.

One day in July 2017, after several weeks of experiencing severe chest pains and respiratory symptoms and being refused medical care other than aspirin, Archie "began experiencing severe and sharp pains in her chest

7

area" while delivering trays as part of her work duties
at the jail.  *Id.* at ¶ 36.  She told correctional staff
of her symptoms and asked "if she could either get medical
assistance or return to her cell to lie down." *Id.* Aside
from Barber, all of the individual defendants named in
this suit were present during this time and were aware
of Archie's requests. *See id.* at ¶ 37. Archie's requests
were denied, and she was required to finish delivering
trays.  *See id.* at ¶ 36.  Immediately after completing
her work, Archie returned to her cell and started
repeatedly pressing an emergency call button for medical
assistance.  *See id.* at ¶¶ 36, 40.  By the time a nurse
arrived to check on Archie, she was nonresponsive, and
she was pronounced dead after attempts to resuscitate her
failed.  *See id.* at ¶¶ 36-37.


## III. DISCUSSION

The court will address in turn each of the counts
that the moving defendants now seek to dismiss.

8

### A.   Wrongful-Death Claim

Former sheriff Meeks moves to dismiss the state-law wrongful-death claim, Count 4, to the extent it is against him, arguing that he is immune from suit on that claim.   State-law tort actions brought against Alabama sheriffs for damages in their individual capacities are subject to the so-called "State immunity" imposed by Article I, Section 14 of the Alabama Constitution whenever the acts alleged were "performed in the line and scope of their employment."   *Ex parte Donaldson*, 80 So. 3d 895, 897 (Ala. 2011) (quoting *Suttles v. Roy*, 75 So. 3d 90, 94 (Ala. 2010)); *see also Ex parte Sumter County*, 953 So. 2d 1235, 1239 (Ala. 2006).   However, this immunity does not extend to individual-capacity suits for damages alleging that such officials "acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, subject to the limitation that the action not be, in effect, one against the State."   *Ex*

9

*parte Moulton*, 116 So. 3d 1119, 1141 (Ala. 2013).[2]

Meeks contends that this articulation of the law of State immunity mistakenly conflates that doctrine with "State-agent immunity," a distinct form of more limited immunity for state officials developed by the Alabama Supreme Court in *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000), and subsequent cases. *See* Reply in Supp. Motion to Dismiss (Doc. 52) at 4-5. Meeks is wrong. The Alabama Supreme Court in *Ex parte Moulton* recognized an exception to State immunity, not State-agent immunity, for actions for damages against State officials in their individual capacities under the conditions described above. *See Moulton*, 116 So. 3d at 1141. As the court said, "this Court today restates the sixth 'exception' to the bar of State immunity under § 14 as follows: ... (b) actions for

_____

2.   In *Todd v. Bailey*, No. 3:12-cv-589-MHT, 2018 WL 1674459 (M.D. Ala. Apr. 6, 2018) (Thompson, J.), this court in a footnote incorrectly indicated that none of the exceptions to State immunity pertains to suits for money damages. *See id.* at *22 n.23.   That footnote overlooked the exception articulated in *Moulton*.

damages brought against State officials in their individual capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law." *Id.* And the court expressly distinguished this holding on the scope of State immunity from any potential application of State-agent immunity to the case. *See id.*; *see also Ala. State Univ. v. Danley*, 212 So. 3d 112, 122-23 (Ala. 2016) (recognizing that *Moulton* articulated an exception to State immunity).

As noted above, this exception to State immunity is subject to the caveat that the suit may "not be, in effect, one against the State." *Moulton*, 116 So. 3d at 1141. To determine "whether an action against a state officer or employee is, in fact, one against the State," courts should "consider such factors as the nature of the action and the relief sought." *Phillips v. Thomas*, 555 So. 2d 81, 83 (Ala. 1989); *see also Moulton*, 116 So. 3d at 1141 (citing *Phillips* to explain this caveat). So,

11

for instance, a negligence action for personal injury
implicates State interests that are "far too incidental
to supply the requisite nexus for extension of
constitutional immunity." *Phillips*, 555 So. 2d at 83
(quoting *Barnes v. Dale*, 530 So. 2d 770, 783 (Ala. 1988)).

A suit is effectively brought against the State when
"a result favorable to the plaintiff would directly
affect a contract or property right of the State," when
"the defendant is simply a 'conduit' through which the
plaintiff seeks recovery of damages from the State," or
when "a judgment against the officer would directly
affect the financial status of the State treasury."
*Danley*, 212 So. 3d at 124 (quoting *Moulton*, 116 So. 3d
at 1131). *But see Moulton*, 116 So. 3d at 1131 (explaining
these as limitations on suits against State officers in
their *official* capacities). At one point, the Alabama
Supreme Court declared that any suit for money damages
brought against an officer in his or her individual
capacity necessarily fails to qualify as a suit against

the State because such a suit seeks personal payment from the officer sued rather than money from the State.  *See Ex parte Retirement Sys. of Ala.*, 182 So. 3d 527, 533 n.4 (Ala. 2015); *Barnhart v. Ingalls*, 275 So. 3d 1112, 1126 (Ala. 2018).  The court has since limited that holding, explaining that when a "necessary element" of an individual-capacity claim is met "<u>only</u> because of the positions" held by the officers, the claim remains barred by State immunity.  *Barnhart*, 275 So. 3d at 1126-27 (emphasis in original).  For example, in an individual-capacity suit for breach of fiduciary duty, a State officer may be immune if the fiduciary duty alleged to have been breached existed only because of the officer's official position.  *See id.*

In sum, Meeks, as a former sheriff, may claim the benefits of State immunity under § 14 on the administrator's wrongful-death claim to the extent that such immunity applies to this case.  There are two ways in which that immunity may be inapplicable: if Meeks's

actions were outside "the line and scope" of his employment, *Donaldson*, 80 So. 3d at 899, or if the administrator alleges that Meeks "acted fraudulently, in bad faith, beyond [his] authority, or in a mistaken interpretation of law," *Moulton*, 116 So. 3d at 1141. If the administrator takes the latter approach, the court must further consider whether the claim is "in effect, one against the State," *id.*, which may be the case even though the claim is brought against Meeks in his individual capacity if a "necessary element" of the wrongful-death claim can be established solely because of Meeks's former position as sheriff. *Barnhart*, 275 So. 3d at 1126.

The complaint alleges that former sheriff Meeks was personally aware of Archie's growing complaints of severe chest pain and shortness of breath and that he deliberately ignored her requests for medical assistance. *See* Second Amended Complaint (Doc. 40) at ¶ 38. Because he undertook these actions in the course of overseeing

**14**

the jail, they may have fallen within the line and scope of his role as sheriff. *See Ex parte Burnell*, 90 So. 3d 708, 711-12 (Ala. 2012). But the complaint adequately alleges that Meeks "acted fraudulently, in bad faith, beyond [his] authority, or in a mistaken interpretation of law," *Moulton*, 116 So. 3d at 1141. There is no good-faith way to intentionally withhold medical care from a person until they die. *Cf. Taylor v. Hughes*, 920 F.3d 729, 734-35 (11th Cir. 2019) (denying § 14 immunity to guards at Covington County Jail who told detainee who had been in car crash to "shut up" when he "cr[ied] out in pain for several hours and stat[ed] that he was 'dying' and 'broke up' inside," leading to death from internal bleeding). As all state officials are bound by the obligations of the United States Constitution, *see* U.S. Const. amend. XIV, § 1, it was not within Meeks's authority to deliberately ignore the pleas for help of a dying inmate in his custody. And to the extent that Meeks believed his alleged conduct was justified, he

acted under a mistaken interpretation of the law.

Nor does the wrongful-death claim, unlike the claim for breach of fiduciary duty considered in *Barnhart*, depend on an element that is met solely because of Meeks's position as sheriff. Wrongful death in Alabama is a statutory claim requiring only that a "wrongful act, omission, or negligence" of the defendant caused the decedent's death and that the decedent would have been able to sue for that act, omission, or negligence if she had not died. Ala. Code § 6-5-410(a). Per the complaint's allegations, Meeks and his correctional staff prevented Archie from obtaining medical care on the day she died by forcing her to finish delivering trays before letting her return to her cell to start calling for emergency medical assistance. *See* Second Amended Complaint (Doc. 40) at ¶¶ 36-38. Causing a person's death by stopping her from getting medical care she needs gives rise to a wrongful-death claim; the statute does not require a defendant who behaves that way to have a

sheriff's duties in order for liability to attach. *See, e.g.*, *Ex parte Russell*, -- So. 3d ---, 2020 WL 3478514, at *2 (Ala. 2020) (wrongful-death claim against hospital guard and supervisor where guard was permitted to call police on emergency room patient, causing the patient's meningitis to go untreated). Accordingly, Meeks is not entitled to State immunity on the administrator's wrongful-death claim.


### B.   Failure to Train and Supervise Claim

Covington County seeks dismissal of Count 5, the failure-to-train-and-supervise claim. For this argument, the county relies on the decision of the *en banc* Eleventh Circuit Court of Appeals in *Turquitt v. Jefferson County*, 137 F.3d 1285 (11th Cir. 1998) (en banc), in which the appellate court held that supervision of inmates in county jails is delegated to Alabama's sheriffs, and that sheriffs act as officers of the State, rather than of individual counties, when operating the

17

jails they oversee.  *See id.* at 1289.

Covington County seems to have misunderstood the allegations made in the second amended complaint.  The administrator does not allege that the county is liable for failing to supervise sheriff Meeks in his oversight of the Covington County Jail.  Instead, the administrator alleges that the county itself contracted for the provision of health care at the jail with Southern Health Partners, the private health-care provider named as a defendant in this case, and that the county failed to supervise Southern Health Partners' performance under that contract or to afford Southern Health Partners sufficient resources to ensure constitutionally adequate medical care at the jail.  *See* Second Amended Complaint (Doc. 40) at ¶¶ 110, 117.  The Eleventh Circuit's decision in *Turquitt* does not free the county from its responsibility to supervise the execution of its own contract for health care at the Covington County Jail. And the complaint adequately alleges that the county

18

failed to supervise this contract by maintaining policies or customs of underfunding Southern Health Partners' staffing levels and services and by declining to monitor the organization's work, leading to constitutionally deficient medical care at the jail. *See id.* at ¶¶ 31-33. As such, this claim against Covington County will not be dismissed.

Former sheriff Meeks and jail administrator Syler also move to dismiss the failure-to-train-and-supervise claim against them based on qualified immunity. Claims for failure to supervise subordinates differ from claims for failure to train and are subject to different--and generally broader--liability requirements. *See Keith v. DeKalb County*, 749 F.3d 1034, 1052 (11th Cir. 2014) (drawing this distinction). Although the administrator's complaint conflates these two theories in discussing Count 5, the allegations presented in support of that claim make clear that the count rests, at least in part, on a theory of failure to supervise, and the court will

analyze it accordingly. *See, e.g.*, Second Amended Complaint (Doc. 40) at ¶ 111.

Determining whether qualified immunity bars relief involves two distinct questions: whether the complaint adequately alleges a violation of a constitutional right and whether that right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

There are three ways in which a plaintiff in the Eleventh Circuit can show that a right was clearly established for the purposes of qualified immunity. First, "the plaintiff can point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the relevant state supreme court"--the case "need not be directly on

point," but it must "have placed the statutory or constitutional question beyond debate." *Patel v. Lanier County*, 969 F.3d 1173, 1186 (11th Cir. 2020) (quoting *J W ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1259-60 (11th Cir. 2018)). Second, the plaintiff "can identify a broader, clearly established principle that should govern the novel facts of the situation." *Id.* Or, third, the plaintiff can demonstrate that the alleged conduct "so obviously violated the Constitution that prior case law is unnecessary." *Id.*

The constitutional right of inmates under the Eighth Amendment not to have serious medical needs deliberately ignored was established in binding case law long before the events alleged in the administrator's complaint. *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (holding unconstitutional "deliberate indifference to serious medical needs of prisoners"); *Brown v. Plata*, 563 U.S. 493, 508 (2011) (noting constitutionally deficient medical care based on failure to provide adequate

treatment to inmate with hypertension).   While claims
involving the mistreatment of pretrial detainees are
governed by the Fourteenth Amendment rather than the
Eighth, the Eleventh Circuit treats the standard for
deliberate indifference to serious medical needs under
the two amendments as "identical."   *Goebert v. Lee
County*, 510 F.3d 1312, 1326 (11th Cir. 2007).[3]

More specifically, the Eleventh Circuit long ago

---

3.   In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015),
the United States Supreme Court held inapplicable to
pretrial detainees the Eighth Amendment's requirement
that prisoners show subjective malice on the part of
their jailers--in addition to objective
unreasonableness--to state an excessive-force claim. *See
id.* at 400-02; *see also id.* at 403 (finding unlawful a
jury instruction requiring that jailers "recklessly
disregarded" the plaintiff's safety).   Given the
relationship between the deliberateness required for
medical-neglect claims under the Eighth Amendment and the
maliciousness required for excessive-force claims under
that amendment, *see, e.g.*, *Whitley v. Albers*, 475 U.S.
312, 320-21 (1986), it is unclear whether subjective
intentionality should remain a necessary element of
medical-neglect claims brought by pretrial detainees
after *Kingsley*.   That said, because the conduct alleged
in this case meets the deliberate-indifference standard,
the court need not consider whether *Kingsley* lowered that
standard for claims brought by pretrial detainees such
as Archie.

22

explained that an inmate with chest pains and shortness of breath may have a serious medical need, particularly when these symptoms are coupled with a life-threatening underlying condition.  *See Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995).  A serious medical need may be determined by "whether a delay in treating the need worsens the condition."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009).  It is a medical condition that "if left unattended, poses a substantial risk of serious harm."  *Melton v. Abston*, 841 F.3d 1207, 1222 (11th Cir. 2016) (quoting *Mann*, 588 F.3d at 1307).  Given that delaying treatment of Archie's severe hypertension symptoms on the day of her death led to her demise, it is understandable that Meeks and Syler do not appear to contest in their motion to dismiss that her medical need was serious.

Moreover, the allegations of the complaint sufficiently indicate that the subordinates of Meeks and Syler at the Covington County Jail were deliberately

23

indifferent to Archie's serious medical need. On the day she died, Archie complained to the jail's correctional staff about "severe and sharp pains in her chest area" and pleaded for medical attention. Second Amended Complaint (Doc. 40) at ¶ 36. The officers refused her requests and ordered her to finish handing out trays before she could return to her cell to call for emergency medical aid. *See id.* Flatly ignoring a detainee's serious medical needs constitutes deliberate indifference. *See Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019) (finding deliberate indifference when guards at Covington County Jail "ignored [the decedent's] cries for help and medical attention").

Finally, the standards by which supervisors may be held liable under § 1983 for the deliberate indifference of their subordinates were clearly established by the time of the instant conduct as well. *See, e.g.*, *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). As a result, the only question left is whether the factual

24

allegations supporting the failure-to-supervise count succeed in making out a claim that Meeks and Syler violated this right.

Under the law of the Eleventh Circuit, "to hold a supervisor liable [under § 1983] a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation." *Keith*, 749 F.3d at 1047-48. The count of the administrator's complaint alleging that Meeks and Syler directly participated in deliberate indifference to Archie's medical needs is separate from the failure-to-supervise count. The court will therefore assess whether the latter claim shows a "causal connection" between the defendants' acts and the alleged constitutional violations. *Id.* Such a connection may be shown when "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation," when the supervisor's "custom

or policy ... result[s] in deliberate indifference to constitutional rights," or when facts indicate "that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.* at 1048 (alterations in original) (quoting *Cottone*, 326 F.3d at 1360).

Meeks and Syler argue that the complaint fails to show a causal connection between their actions and the alleged constitutional violations "because it fails to demonstrate a history of widespread abuse." Br. in Supp. Motion to Dismiss (Doc. 42) at 17-18. But demonstrating a history of widespread abuse is only one of three ways in which a plaintiff may show the "causal connection" necessary to establish liability on a failure-to-supervise claim. *Keith*, 749 F.3d at 1048. The court need not decide whether the previous incidents alleged in the complaint are sufficient to demonstrate that abuse was widespread at the jail if the

administrator's complaint otherwise succeeds in showing the requisite causal connection.

It does.  The facts alleged in the complaint readily support an inference that Meeks and Syler "knew that the[ir] subordinates would act unlawfully and failed to stop them from doing so." *Id.* (quoting *Cottone*, 326 F.3d at 1360).  According to the complaint, Meeks and Syler were aware of Archie's medical needs before and during the emergency that ended in her death. *See, e.g.*, Second Amended Complaint (Doc. 40) at ¶¶ 23, 37-40, 59-61. Moreover, the complaint alleges that the defendants knew that Archie was not receiving treatment from their subordinates for her serious medical problems and that they failed to ensure that their subordinates would provide such treatment. *See, e.g.*, *id.* at ¶¶ 37-40.  The complaint also alleges that it was widely known at the jail that Dr. Barber routinely skipped visits with inmates seeking medical attention and often came only once per month to the jail to provide medical care. *See*

27

*id.* at ¶ 26.  These allegations--which at this stage must be accepted as true--support an inference that Meeks and Syler knew about what the complaint terms Barber's "lackadaisical manner of treating inmates," *id.* at ¶ 28, were aware that their subordinates were refusing Archie treatment for her severe symptoms on the day she died, *see id.* at ¶¶ 36-38, and declined to intervene.

Although Meeks and Syler acknowledge that any of the three approaches listed above is sufficient to establish the requisite causal connection under Eleventh Circuit law, *see* Br. in Supp. Motion to Dismiss (Doc. 42) at 17, they argue elsewhere that a pattern of previous violations is nonetheless required to make out the administrator's claims here, *see id.* at 18.  They base this argument on the Supreme Court's decision in *Connick v. Thompson*, 563 U.S. 51 (2011), particularly the Court's indication that, "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for

purposes of failure to train." *Id.* at 62 (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).

The very terms of the sentence that Meeks and Syler cite from *Connick* demonstrate its inapplicability here. The statement from *Connick* quoted above applies to claims for failure to train subordinates, not to claims for failure to supervise. *Compare Keith*, 749 F.3d at 1053 (quoting *Connick* for the failure-to-train standard), *with*, *id.* at 1048 (noting the three ways described above to show a causal connection for a failure-to-supervise claim). The Supreme Court's decision in *Connick* is inapposite, and neither Meeks nor Syler is entitled to qualified immunity on the failure-to-supervise claim.

### C. Failure to Act Claim

Covington County, Meeks, and Syler all seek dismissal of Count 6, the failure-to-act claim, on the same grounds described above. The allegations in the complaint pertaining to the failure-to-act claim appear redundant

29

with either Count 5, the failure-to-supervise claim, or
Count 1, the deliberate indifference claim. *See* Second
Amended Complaint (Doc. 40) at ¶¶ 116-21.  Indeed, as to
the county, Meeks, and Syler, it is not at all clear what
distinguishes the failure-to-act claim from the
failure-to-supervise claim.  And the Supreme Court has
declined to recognize a general failure-to-act claim
under the Due Process Clause, holding that the
Constitution instead imposes more specific and
circumscribed obligations such as the responsibility of
jail officials to provide adequate medical care--a duty
addressed by the administrator's deliberate indifference
and failure-to-supervise claims. *See DeShaney v.
Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189,
198-200 (1989).

Accordingly, because the theory of the
administrator's failure-to-act claim is not sufficiently
established in precedent, Meeks and Syler are entitled
to qualified immunity on that count.  Similarly, although

the court is unpersuaded by the county's argument from *Turquitt* for the reasons discussed above, the county is nonetheless entitled to dismissal of Count 6 against it for failure to state a claim because the count does not make out allegations sufficient to show a violation of any established legal duty.

### D.  ADA and Section 504 Claims

Covington County also moves to dismiss the administrator's ADA and Section 504 claims, Counts 2 and 3, for failure to state a claim under those statutes. For all purposes relevant to the county's motion to dismiss, the same standards apply to the ADA and Section 504, so the court will not separately analyze the two claims at issue. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

Title II of the ADA, the statutory section under which the administrator's claim is brought, provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001). The county argues that the factual allegations supporting the administrator's ADA and Section 504 claims may show deliberate indifference to Archie's medical needs, but that they do not show discrimination on the basis of disability. *See* Br. in Supp. Motion to Dismiss (Doc. 42) at 8. As the county explains, "it is alleged that the decedent, who suffered from hypertension, was denied necessary medical treatment for her condition while detained in the Covington County Jail." *Id.* "The alleged fact that Defendants failed to provide adequate medical care for the decedent's hypertension does not, standing alone, support the claim that they discriminated

32

against her because of her hypertension." *Id.* at 7.[4]

As with the failure-to-supervise claim, the trouble for the county is that the allegations it points to are not the ones on which the administrator relies to support the complaint's ADA and Section 504 claims. Instead, the administrator alleges that the county, in contracting for health care services at the jail, failed to provide sufficient staff and training of medical personnel for

---

4. In a footnote in defendants' reply brief, the county notes for the first time that "an argument can be made that the Decedent was not disabled as defined by" the ADA and Rehabilitation Act. Reply in Supp. Motion to Dismiss (Doc. 52) at 4 n.1. This is so, the county says, because the complaint "made no allegation that the Decedent was in any way limited because of her hypertension." *Id.* This argument, to the extent that defendants' footnote endeavors to press it, was not included in the motion to dismiss and so will not be addressed at this time. *United States v. Evans*, 473 F.3d 1115, 1120 (11th Cir. 2006) ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court." (quoting *Herring v. Sec'y, Dep't of Corrs.*, 397 F.3d 1338, 1342 (11th Cir. 2005))). Moreover, it mischaracterizes the allegations of the complaint, which include, *inter alia*, that Archie's hypertension caused "debilitating" pain that interfered with her ability to carry out her work at the jail. Second Amended Complaint (Doc. 40) at ¶¶ 36, 40.

inmates with serious medical needs, such as Archie, to avoid death or other harm due to inadequate medical assistance. *See* Second Amended Complaint (Doc. 40) at ¶¶ 33, 80. In other words, the administrator alleges that the county, through its contract with Southern Health Partners, provided adequate medical care for non-disabled inmates but not for inmates with conditions serious enough to make them "individual[s] with a disability" under the ADA, 42 U.S.C § 12131(2).

The United States Supreme Court has held that medical services provided to inmates are among the "services, programs, or activities of a public entity" to which the ADA and Section 504 extend. *Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998) (quoting 42 U.S.C. § 12132). Providing staff and training sufficient to address the needs of inmates with minor medical issues but not those of inmates with disabilities discriminates against disabled inmates in the provision of such services. *See, e.g.*, Second Amended Complaint (Doc. 40)

**34**

at ¶¶ 23-25 (alleging that Archie was repeatedly given aspirin rather than more significant medical intervention in response to her high blood pressure and complaints of severe chest pains). The administrator's ADA and Section 504 claims will not be dismissed.

* * *

Accordingly, it is ORDERED that:

(1) Defendants' motion to dismiss (Doc. 41) is granted to the extent that Count 6 of the complaint, as alleged against defendants Covington County, Dennis Meeks, and Alan Syler, is dismissed.

(2) In all other respects, the motion to dismiss (Doc. 41) is denied.

DONE, this the 29th day of March, 2021.

<u>     /s/ Myron H. Thompson     </u>
UNITED STATES DISTRICT JUDGE